UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARK AWOLESI, M.D.

                        Plaintiff,

                                        **DECISION AND ORDER**

                                          10-CV-6125

                        v.
ERIC SHINSEKI, Secretary, Department of
Veterans Affairs

                        Defendant.
_____

## INTRODUCTION

     Plaintiff, Mark Awolesi, M.D. ("Plaintiff"), brings this

action  pursuant to Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e *et seq.*, alleging race-based discrimination in the

form of a hostile work environment and retaliation against, Eric

Shinseki, Secretary of the Department of Veterans Affairs

("Defendant"), based on his employment at the Buffalo VA Medical

Center ("Buffalo VA"). (Docket No. 1.)  Defendant moves for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure ("Rule 56"), contending that Plaintiff has not produced

sufficient evidence of retaliation or a hostile work environment

such that a reasonable jury could find in his favor. (Docket No.

32.) Plaintiff opposes the motion, contending that there are

material issues of fact which preclude summary judgment. (Docket

No. 37.)  For the reasons discussed herein, the Court grants in

part and denies in part Defendant's motion for summary judgment.

**BACKGROUND**

The following facts are taken from the parties' submissions pursuant to Local Rule 56(a), and the entire record and are not in dispute unless otherwise noted. (Docket Nos. 32, 37.) Prior to the events relevant to this lawsuit, Plaintiff and Carlos Li, M.D. ("Li"), the Chief of the Cardiothoracic Surgical Service and Plaintiff's supervisor at the Buffalo VA, engaged in mediation to settle Plaintiff's allegations of racial discrimination against Li relating to events occurring between 2005 and 2007. After meetings and/or mediation sessions with the Chief of Surgery, Miguel Rainstein, M.D. ("Rainstein") and other Buffalo VA employees, the parties settled the allegations and entered into a settlement agreement in early 2008. This Court previously discussed the settlement agreement and its effect on this lawsuit in its Decision and Order granting Defendant's motion for partial summary judgement and those facts will not be repeated here. Awolesi v. Shinseki, No. 10-6125, 2012 WL 527631 (W.D.N.Y. February 16, 2012).(Docket No. 25.) The following facts relate only to events and/or claims that were not covered by the settlement agreement.

Plaintiff, a Nigerian black male, was employed by the Buffalo VA as a cardiothoracic surgeon under Li's supervision from September 2000 through September 2009. Li reported to Rainstein, Chief of Surgery, from 2005 until 2008. Rainstein was then promoted

2

to Chief of Staff, replacing Avery Ellis, M.D. ("Ellis") in 2008. Beginning in April 2008, Hasan Dosluoglu ("Dosluoglu") replaced Rainstein as the Chief of Surgery. The Chief of Surgery reports to the Chief of Staff for clinical issues and to the Medical VA Care Line Manager, Jacqueline Clifford ("Clifford"), for administrative issues. The Chief of Staff reports to the Medical Center Director. During the relevant time period, David West ("West") served as the interim Medical Center Director until June 21, 2009 when he was replaced by William F. Feeley ("Feeley").

Plaintiff alleges that Dr. Li "created an unabated hostile environment based on Plaintiff's race." Awolesi Aff. at ¶¶ 9, 20. He also alleges that he suffered retaliation for complaining of discrimination by Li in 2007 and at various times during the remainder of his tenure at the Buffalo VA. See e.g., Awolesi Aff. at ¶12.

Following Plaintiff's complaint in 2007, which ultimately led to the mediation and settlement, he alleges that Li "marginalize[d] [his] work by performing most of the cardiac surgery cases" and that Plaintiff's workload dropped from approximately 50% to 25-30% of the total cardiac surgeries. Awolesi Aff. at ¶12. Defendant contends that the reduction in Plaintiff's caseload was due, in part, to the overall reduction in cardiac surgeries at the hospital during the relevant time period. Additionally, after Plaintiff complained that he was not getting enough cases in early 2008, Li

adopted a new method of assigning cases in March 2008. Li created an "on call" schedule and the cases were assigned to the surgeon who was on call. Li states that he attempted to divide the on call days evenly between he and Plaintiff, but that this depended on the surgeon's vacation schedule. Between March 2008 and November 2008, Plaintiff was scheduled for 127 on call days and Li for 141 on call days. During the months of May and August 2008, Li worked more on call days due to Plaintiff's vacation schedule. The parties do not indicate the number of on call days assigned to Plaintiff and Li during the remainder of Plaintiff's tenure or whether Li had an equal number of vacation days. Plaintiff and Li had disagreements regarding the vacation and on call schedules throughout the remainder of Plaintiff's employment at the Buffalo VA. Pl. Response to Def. Local Rul 56(a)(1) Statement ("Pl. Response") at ¶¶ 129-136.

Plaintiff also alleges Li had a "lynched" monkey displayed on a bookshelf in his office from 2008 through the remainder of Plaintiff's employment. Plaintiff testified that he was offended by the monkey, which was originally attached to Li's door with a balloon attached by a string at the monkey's neck. Awolesi Aff. at ¶17. Plaintiff perceived this as a racist symbol and testified that it was displayed on Li's door shortly after Plaintiff complained of discrimination. Awolesi Dep. at pg. 68. The monkey and the balloon were given to Li by a coworker. Id. Six or seven

months later, Plaintiff informed Li that he found the monkey offensive. Awolesi Dep. at pg. 74. Thereafter, Li removed the monkey from his door, but he displayed the monkey on a shelf with a collection of other stuffed animals in his office. Awolesi Dep. at pg. 81-2. Plaintiff testified that the monkey continued to be visible through Li's glass doors.

Plaintiff also complains that Clifford and Rainstein told him at a December 2007 meeting that he was "too sensitive" and that they did not understand his complaints of discrimination against Li because they were "not black men." He alleges that at this meeting, he was advised that he would be fired if he did not "cooperate" with Li. Pl. Additional Material Facts ("Pl. Facts") at ¶14. He also states in his affidavit that at another meeting with Rainstein in 2008, he was advised that he would be fired if he did not discontinue his discrimination complaints against Li. Awolesi Aff. at ¶15. However, Plaintiff testified that this statement was actually in relation to a complaint he made to Rainstein about Li's medical practices, rather than his discrimination complaints. Awolesi Dep. at pg. 245-6.

Plaintiff also alleges that Li threatened to call his patient regarding a procedure Plaintiff wanted to perform. Li and Plaintiff disagreed about the necessity of the procedure, but Li did not call Plaintiff's patient and Rainstein ultimately allowed Plaintiff to perform the procedure. Pl. Response at ¶¶ 137-142.

Plaintiff alleges that Li refused to speak to him or his secretary, a black female, and that she was later removed as his secretary at Li's request. Awolesi Aff. at ¶¶ 18-19.

Finally, Plaintiff alleges that in January 2009, Dosluoglu gave him a performance evaluation of "highly satisfactory" instead of "outstanding" for the 2008 fiscal year. In the previous two years Plaintiff, reviewed by Rainstein, received an evaluation of "outstanding." However, in 2008, Clifford, the Medical Care Line Manager, recommended more critical evaluations of employees. Dosluoglu, thereafter, reviewed Plaintiff and Li, and both surgeons reviews changed from "outstanding" to "highly satisfactory." Plaintiff admits that Dosluoglu may have been a tougher grader than Rainstein. Pl. Response at ¶¶ 120-128.

Allegations of Patient Abuse[1]

In December 2008, a nurse at the VA reported an incident of patient abuse relating to a procedure that Plaintiff performed on a patient which resulted in injury. The nurse believed that Plaintiff performed the procedure too forcefully. Plaintiff admits that he performed the procedure, but he asserts that it was not too forceful. Plaintiff admits that the nurse was not motivated by racial animosity when he reported the incident.

The Buffalo VA's Patient Abuse Policy provides that when

---

[1] The facts relating to the patient abuse investigation are found in Plaintiff's Response to Defendant's Local Rule 56(a)(1) Statement at paragraphs 12-89, and are not in dispute unless otherwise noted.

patient abuse is reported, the Medical Center Director, at the time, David West, must determine whether to commence an administrative investigation and if so, he must convene an administrative investigative board ("AIB") and determine what actions to take following the investigation. The policy also states that, "When deemed appropriate by management, the employee will be temporarily detailed to another unit or service, as appropriate, until the investigation concludes." Although lesser consequences are possible for minor offenses, the mandatory penalty for patient abuse is termination.

Plaintiff was informed by Dosluoglu in late December 2008 that the patient abuse complaint had been made and that he would be temporarily removed from patient care. Dosluoglu made the decision to remove Plaintiff from patient care, which Plaintiff admits was required by the VA Patient Abuse Policy.

After he was removed from patient care, he was assigned by Clifford to the medical library. West assembled an AIB to investigate the allegations against Plaintiff. West was not aware of Plaintiff's prior discrimination complaints. Plaintiff admits that West assembled the AIB in accordance with the Buffalo VA patient abuse policy.

The AIB interviewed witnesses, including Li, and examined exhibits. The only witness that Plaintiff contends was motivated by racial animosity was Li, however, several witnesses testified

that the procedure was performed either with too much force or that is was unnecessary in the first place. Plaintiff maintains that the procedure was indicated and that it was not performed too forcefully. Li testified that a related procedure performed by Plaintiff on the same patient was properly performed.

The AIB concluded that Plaintiff performed the procedure in question incorrectly and too forcefully, however, they also found that the related procedure performed on the same patient was warranted and that Plaintiff's actions were unintentional. Accordingly, they did not recommend termination. In addition to the patient abuse findings, the AIB found that Plaintiff was "unresponsive and resistant to input from the interdisciplinary team members; resisted practicing evidence-based medicine; resisted following protocols; and did not consult with medical specialists." They determined that he needed additional training.

West then directed Rainstein, Dosluoglu and Clifford to verbally counsel Plaintiff about the patient abuse charge and ordered that a review, under the direction of Rainstein, be undertaken to investigate the findings of the AIB that were unrelated to patient abuse. Rainstein, Dosluoglu and Clifford met with Plaintiff in February 2009, explained the findings of the AIB and informed him that he would receive refresher training in performing neurological examinations. They also informed him that Li would meet with him to review his performance expectations and

to address the findings of the AIB that were unrelated to patient abuse.

Clifford testified that Plaintiff did not want to communicate with Li. Plaintiff contends, however, that Li refused to communicate with him. Plaintiff told Rainstein, Clifford and Dosluoglu that he felt that Li was a racist, and they asked if he had any new issues to report that had occurred after the mediation and settlement agreement in early 2008. Plaintiff did not report any new grievances, but continued to complain about the issues which were resolved through mediation. They informed Plaintiff that Li was his superior, responsible for the cardiothoracic service, and that he was to follow Li's directions. Plaintiff testified that he told Clifford, Dosluoglu and Rainstein that he would not follow Li's directions because Plaintiff felt that he was "an independent physician ... who has been practicing in that hospital for eight years with exemplary results."

On March 6, 2009, Plaintiff completed refresher training[2] and on March 31, 2009, he met with Dosluoglu, Li and the surgery business manager to discuss a performance plan to address the issues raised by the AIB which were unrelated to patient abuse. Plaintiff refused to sign or follow the plan or to follow any instructions by Li regarding his performance. Dosluoglu consulted

---

[2]Plaintiff complains that he was also required to attend training on physical examinations in the intensive care unit. It is unclear whether the refresher training and the training which took place in the intensive care unit were the same.

with Rainstein, Clifford and West regarding Plaintiff's failure to follow Li's instructions and the plan, and refused to return Plaintiff to patient care until these issues were resolved. Then, on April 27, 2009, Plaintiff was sent a memorandum directing him to comply with the performance plan. It is unclear whether Plaintiff followed any of the directives in the plan, but he was thereafter returned to patient care and given new cases.

Plaintiff's Termination from the Buffalo VA[3]

Plaintiff was ultimately terminated from his position at the Buffalo VA in September 2009. Defendant states that based on the dramatic decrease in cardiac surgeries performed at the Buffalo VA, in fiscal years 2008 and 2009, Clifford, Rainstein and Li believed that the workload could not sustain two surgeons. The hospital attempted to increase the workload by contacting local medical providers, but the workload did not improve. In September 2009, Medical Center Director William F. Feeley decided to eliminate one of the cardiothoracic surgical positions.

Initially, Clifford, who is responsible for the oversight of hiring and firing employees, did not recommend which surgeon's position should be eliminated, but, Plaintiff's position was ultimately eliminated on September 23, 2009. Plaintiff's position was eliminated based on a law which requires that healthcare

---

[3]The facts relating to Plaintiff's termination are found in Plaintiff's Response to Defendant's Local Rule 56(a)(1) Statement at paragraphs 90-119, and are not in dispute unless otherwise noted.

providers at the Department of Veteran's Affairs be U.S. citizens. Plaintiff was hired under an exception to this rule, but he did not become a U.S. citizen until September 2009. Li had been a citizen of the U.S. since 1978. Plaintiff disputes Defendant's characterization of his position as a temporary appointment under the exception to this law, but he admits in his response to Defendant's Local Rule 56(a)(1) Statement that removing Li instead of Plaintiff would have been contrary to this law. Pl. Response at ¶ 117.

## DISCUSSION

Pursuant to Rule 56, a court shall grant a motion for summary judgment if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed.R.Civ.P. 56(a). Once the movant has met this burden, the burden shifts to the nonmovant who must "come forward with evidence to allow a reasonable jury to find in his favor" on each of the elements of his prima facie case. See Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir.2001); Celotex Corp. v. Catrett, 477 U.S. 317, 325-27 (1986). The court must draw all factual inferences, and view the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Celotex Corp., 477 U.S. at 322. However, a nonmovant benefits from such factual

inferences "only if there is a 'genuine' dispute as to those facts." See <u>Scott v. Harris</u>, 550 U.S. 372, 127 S.Ct. 1769, 1776 (2007).

## A. <u>Retaliation</u>

Plaintiff's retaliation claims are analyzed under the <u>McDonnell Douglas</u> burden-shifting framework. See <u>McDonnell Douglass Corp. v. Green</u>, 411 U.S. 792, 802 (1973). Under this framework, Plaintiff must first establish a prima facie case of discriminatory retaliation by showing: (1) participation in a protected activity known to the Defendant; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action. See <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 548 U.S. 53, 68 (2006); <u>Holt v. KMI-Continental</u>, 95 F.3d 123, 130 (2d Cir. 1996), <u>cert</u>. <u>denied</u>, 1997 WL 71191 (May 19, 1997); <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1308 (2d Cir. 1995) (citations omitted). Once a plaintiff has established a prima facie case of discrimination, the defendant must articulate a legitimate, nondiscriminatory rationale for its actions. See <u>Texas Dept. Of Community Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). The burden then shifts to the plaintiff to demonstrate that the employer's stated rationale is merely a pretext for discriminatory retaliation and that retaliation is the true reason for the defendant's actions. See <u>McDonnell-Douglas Corp.</u>, 411 U.S. at 802; <u>see</u> <u>also</u> <u>Slattery v. Swiss Reinsurance America Corp.</u>, 248 F.3d 87 (2d Cir.

2001).

Defendant contends that Plaintiff has not produced sufficient evidence of retaliation for a reasonable jury to conclude that he was subject to retaliation based on the patient abuse investigation or his termination.  Defendants do not address whether Plaintiff's other allegations of retaliation are sufficient to withstand summary judgment, addressing them only in the context of Plaintiff's hostile work environment claim.

Patient Abuse Investigation

Plaintiff contends that the Buffalo VA's investigation into the allegation of patient abuse and the corrective actions taken following the investigation were retaliation for his complaints of discrimination. Plaintiff, however, has not met his burden of coming forward with sufficient evidence of discriminatory retaliation with respect to the actions taken by the Dosluoglu, Clifford, Rainstein, West and the AIB in connection with the patient abuse investigation to rebut the Defendant's legitimate, non-discriminatory reasons for its actions. Specifically, the Court finds that Dosluoglu, Clifford, Rainstein, West and the AIB acted in accordance with the Buffalo VA Patient Abuse Policy and that Plaintiff has not come forward with evidence to rebut this legitimate, non-discriminatory reason for the actions taken in response to the allegation of patient abuse.

In his Response to Defendant's Local Rule 56(a)(1) Statement,

Plaintiff admits that the nurse who initially reported the potential patient abuse did not act with discriminatory animus. Pl. Response at ¶21. Employees are responsible for reporting patient abuse according to the Buffalo VA Patient Abuse Policy. Pl. Response at ¶24.

Plaintiff conclusively states in his affidavit that Dosluoglu, Rainstein and Clifford were "acting out of racial animosity and in retaliation for [his] engaging in protected EEO activity...in assembling the AIB." Awolesi Aff. at ¶ 27. He also conclusively states that removing him from patient care and assigning him to the library were retaliatory. Pl. Mem. of Law at 18. However, he admits that West assembled the AIB in accordance with the Buffalo VA Patient Abuse Policy, that West did not know of his prior complaints of discrimination and that West did not act out of racial animosity. Pl. Response at ¶¶ 37, 39, 40, 54. He also admits that the Patient Abuse Policy specifically provides that an accused employee may be temporarily removed from patient service, and he does not present any evidence that Dosluoglu was acting out of discriminatory animus or in retaliation for his prior complaints of discrimination when he made the decision to remove Plaintiff. Plaintiff also testified that he did not inform Dosluoglu of his EEO activity until after he was accused of patient abuse, in January or February of 2009. Awolesi Dep. at pg. 142. He further admits that he "has no firsthand evidence that Clifford, Rainstein,

Ellis, Dosluoglu or West were acting our of racial animosity in connection with the patient abuse investigation" (Pl. Response at ¶ 40), and the record does not contain any evidence that they were acting with a discriminatory or retaliatory motive.

Further, Plaintiff has not presented evidence that the members of the AIB, which included Ellis and several other Buffalo VA doctors and nurses, harbored any racial animosity or acted in retaliation for Plaintiff's having complained of discrimination. Plaintiff contests this lack of evidence, however, he does not contest it with evidence of discriminatory or retaliatory motives on the part of the members of the AIB. Rather, he simply states that it is a "fact" that he did not use too much force in conducting the procedure and reiterates the many actions taken by the Buffalo VA in connection with the investigation and conclusively labels them retaliatory and/or discriminatory. Pl. Response at ¶ 43.

Other than his conclusory allegations that the actions of the Buffalo VA administration in connection with the patient abuse investigation were discriminatory and retaliatory, which directly contradict the admissions he made in his Response to Defendant's Local Rule 56(a)(1) Statement, Plaintiff has not presented evidence of discrimination or retaliation to rebut Defendant's legitimate, non-discriminatory reasons for its actions with respect to the patient abuse investigation. Further, he admits in his Response to

Defendant's Local Rule 56(a)(1) Statement that the actions taken were authorized by the Buffalo VA Patient Abuse Policy, and he does not present any admissible evidence that following the Patient Abuse Policy was discriminatory in and of itself. See Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012)("an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner...The relevant question is therefore whether the employer has simply applied reasonable disciplinary procedures to an employee or if the employer has exceeded those procedures and thereby changed the terms and conditions of employment.")(quoting Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006)).

Plaintiff refers to several incidents in which other, caucasian employees were subject to a patient abuse investigations or were accused of patient abuse and were allegedly treated differently. However, after reviewing Plaintiff's testimony it is clear that he either does not have personal knowledge of the events relating to these accusations or investigations or they are based on hearsay. See DiStiso v. Cook, 691 F.3d 226, 230 (2d Cir. 2012)("where a party relies on affidavits or deposition testimony to establish facts, the statements "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the

matters stated.")(citing Fed.R.Civ.P. 56(c)(4); see Fed.R.Evid. 602)).    Additionally, Plaintiff has not presented sufficient evidence from which the Court could even discern whether these comparators are similarly situated in all material respects. Graham v. Long Island Rail Road, 230 F.3d 34, 40 (2d Cir.2000).    For example, there is no evidence of the severity of the allegations against the alleged comparators or whether they reported to the same individuals.    Id.; Conway v. Microsoft Corp., 414 F.Supp.2d 450, 459-460 (W.D.N.Y. 2006).    Therefore, the Court finds that Plaintiff has not raised a material issue of fact with respect to whether he was treated differently than other, similarly situated Caucasian employees accused of patient abuse.

Accordingly, the Court finds that there are no material issues of fact with respect to Plaintiff's claim for retaliation based on the patient abuse investigation and that Plaintiff has not presented sufficient evidence of discrimination to rebut the Defendant's legitimate, non-discriminatory reasons for its actions. Therefore, Defendant's motion for summary judgement dismissing Plaintiff's retaliation claim based on the patient abuse investigation is granted.

Plaintiff's Termination

Plaintiff alleges that his termination in September 2009 was in retaliation for his complaints of discrimination throughout his employment at the Buffalo VA.    The Court finds that Plaintiff has

17

not presented sufficient evidence of discrimination to rebut the Defendant's legitimate, non-discriminatory reason for his termination.

Plaintiff admits that the caseload at the Buffalo VA had substantially decreased and he has not offered any evidence to suggest that Medical Center Director Feeley's decision to eliminate one of the cardiothoracic surgeon positions because of this decrease in workload was discriminatory or retaliatory. Further, while he disputes whether his employment at the Buffalo VA was considered temporary, he admits that when the decision to terminate one of the cardiothoracic surgeon's positions was made, it would have been contrary to the law governing employment with the Department of Veterans Affairs to have fired Li instead of Plaintiff, based on their respective citizenship status. Accordingly, because Defendant has proffered a legitimate, non-discriminatory reason for terminating Plaintiff's position, and because Plaintiff has not presented any evidence to demonstrate that this reason is a pretext for discrimination, Defendant's motion for summary judgment with respect to Plaintiff's termination is granted.

<u>Remaining allegations of retaliation</u>

Plaintiff also alleges a claim for retaliation based on the remaining facts in the complaint, for example, Li's conduct following Plaintiff's discrimination complaints against him in late

2007 and several statements made by his other superiors in connection with the complaints he made about Li. Defendants do not specifically address these facts in the context of Plaintiff's retaliation claim. However, it is clear from Plaintiff's opposition papers that he alleges that these actions were retaliatory. Because Defendant's have not moved for summary judgment of Plaintiff's retaliation claim based on these facts and because the there are material issues of fact, the Court finds that Plaintiff may proceed with this claim.

Without addressing all of the remaining facts, the Court notes, for example, that Plaintiff alleges that shortly after they engaged in mediation relating to his complaints of discrimination against Li his workload drastically decreased. There are questions of fact remaining with respect to the exact decrease in Plaintiff's workload and whether Li divided the on call schedule equally between the two surgeons for the remainder of Plaintiff's tenure. Further, Plaintiff alleges that he was told to stop complaining about Li and to cooperate with Li or he would be fired. While these statements may not have been directly related to his discrimination complaints, the facts, viewed in the light most favorable to the Plaintiff, reveal that Plaintiff often complained about Li and that he frequently complained that Li's actions were discriminatory or retaliatory. The Court finds a reasonable jury could conclude that the reduction in work hours and the warnings

regarding his complaints about Li could "dissuade[] a reasonable worker from making or supporting a charge of discrimination." See Burlington Northern and Santa Fe Ry.Co. v. White, 548 U.S. 53, 68 (2006).

## B.   **Hostile Work Environment**

A plaintiff alleging a claim for a hostile work environment must establish "[1] that the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002).  The test to determine whether a plaintiff was the victim of a hostile work environment "has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Alfano, 294 F.3d at 374 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)). The Court must look at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct is physically threatening or humiliating, and whether such conduct unreasonably interferes with the plaintiff's work performance. See Harris 510 U.S. at 23.

After reviewing the record in its entirety, and considering the facts in the light most favorable to the Plaintiff, the Court

finds that there are material issues of fact as to whether Plaintiff was subjected to a hostile work environment. Specifically, the Court finds that a reasonable jury could conclude that Li's actions, including placing a monkey with a balloon tied around its neck in his office after Plaintiff complained that he found the monkey offensive to black people, not speaking to Plaintiff or his secretary who was also black, as well as the general discord between the two which escalated after Plaintiff complained of discrimination and which included disagreements over scheduling and a reduction in the number of cases Plaintiff received compared to Li, were sufficient to alter the terms and conditions of Plaintiff's employment and to create an abusive working environment. The fact that Li was Plaintiff's superior and that Plaintiff was instructed by other members of the administrative staff at the Buffalo VA to do what Li said despite his continued complaints of discrimination contributes to the potentially abusive nature of his employment.

The Court specifically notes that there are material issues of fact as to the inferences that can be drawn from the incident involving the monkey and that the facts, viewed in the light most favorable to the Plaintiff, reveal that this incident combined with the other incidents between he and Li and the fact that his complaints about Li were not well received by other members of the administration could lead a reasonable jury to conclude that

Plaintiff was subjected to a hostile work environment. Accordingly, Defendant's motion for summary judgement on Plaintiff's hostile work environment claim is denied.

## CONCLUSION

For the reasons set forth herein, Defendant's motion for summary judgment is granted in part and denied in part. Defendant's motion for summary judgement dismissing Plaintiff's claim for retaliation based on the patient abuse investigation and his termination is granted. The Court finds that there are material issues of fact with respect to Plaintiff's claim for retaliation based on the remaining facts in the complaint and his claim for a hostile work environment.

**ALL OF THE ABOVE IS SO ORDERED.**

  S/ MICHAEL A. TELESCA
HON. MICHAEL A. TELESCA
United States District Judge

Dated:     Rochester, New York
           February 7, 2013